**Karmon COGDILL and Sammye Cogdill, Plaintiffs–Appellants,**

**v.**

**Cary FLANAGAN, by and through his Defendant ad Litem, Kurt LARSON, Defendant–Respondent.**

No. SD 32219.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 7, 2013.

Motion for Rehearing and/or Transfer to the Supreme Court Denied Oct. 23, 2013.

James E. Corbett, of Springfield, MO, for Appellant.

Ralph V. Hart, of St. Louis, MO, for Respondent.

WILLIAM W. FRANCIS, JR., C.J.

Karmon Cogdill ("Karmon") and Sammye Cogdill ("Sammye"), husband and wife, (collectively "the Cogdills") appeal the judgment of the trial court entered following a jury trial based upon their "Second Amended Petition" that asserted claims arising from a car accident in which the tractor-trailer driven by Karmon collided with a vehicle driven by Cary Flanagan ("Flanagan").[1]

**Factual and Procedural Background**

In the early morning hours of February 12, 2005, Karmon was driving a tractor-trailer eastbound on I–44 in Phelps County, when he came upon a vehicle lying upside down in the road. The upside-down vehicle had been driven by Flanagan before he was killed in a separate accident.[2] Karmon struck Flanagan's vehicle, causing Karmon's truck to swerve and strike a guardrail.

On April 10, 2007, the Cogdills filed a "Petition" for damages against Flanagan. Due to Flanagan's death, the Cogdills requested the court appoint a defendant ad litem and the court appointed attorney Kurt J. Larson ("DAL").

On December 8, 2011, the Cogdills filed a "Second Amended Petition," alleging Karmon was driving his truck eastbound

---

1. For clarity and ease of analysis, we have chosen to refer to some of the parties by their first names. We mean no disrespect in doing so.

2. The "Missouri Uniform Accident Report," which was admitted into evidence by the Cogdills, reported Flanagan's vehicle had "traveled off the left side of the roadway ... [and Flanagan] was totally ejected from the vehicle."

on I–44 when he collided with Flanagan's vehicle, which was lying on its top "in a portion of I–44[.]" The Cogdills alleged Flanagan had the "right of control over his vehicle[ ]"; that a car "does not usually end up on its top in a traveled portion of I–44 if the driver uses due care[ ]"; Flanagan was speeding; and had "operated [his car] while intoxicated to the extent his driving ability was impaired." As a direct result of Flanagan's negligence, the Cogdills alleged Karmon was damaged in that he suffered injury to his chest, back and neck; post-traumatic stress disorder ("PTSD"); loss of income; diminution of earning capacity; loss of household contributions; and incurred medical expenses. Karmon also requested an award of punitive damages alleging Flanagan, in driving while intoxicated, "showed a complete indifference to or conscious disregard for the safety of others[.]" Sammye alleged she was entitled to "derivative damages" for the injuries to Karmon.

On January 6, 2012, DAL filed an "Answer to Plaintiff's [sic] Second Amended Petition." DAL denied all of the Cogdills' allegations except for admitting jurisdiction and venue were proper in Phelps County, and that Sammye was the wife of Karmon. DAL asserted an affirmative defense that the "carelessness and negligence of [Karmon] in failing to keep a careful lookout and in driving at an excessive rate of speed directly caused or directly contributed to cause whatever injuries or damages [Karmon] sustained, if any, and for that reason [Karmon] cannot recover herein."

A jury trial was held on April 11 and 12, 2012. Sometime in the week prior to trial, DAL informed the Cogdills that they were going to admit liability for the accident, and filed a motion in limine to prevent the Cogdills from introducing evidence of Flanagan's intoxication. An amended answer was never filed by DAL where they admitted liability. There was no pre-trial conference with the trial court. On the morning of trial, the trial court announced, on the record, that DAL's motion in limine was granted and allowed Cogdills' counsel to make an offer of proof. The following colloquy then took place:

[COGDILLS' COUNSEL]: I understand that [DAL] filed a motion in limine to exclude evidence of the—any liability or the cause of the accident, including the fact that [Flanagan] was legally intoxicated. As a matter of fact, [Flanagan] was .129 percent blood alcohol, um, by a measure.

*And we intended to prove up liability in this case, and that was our intent based on Ruppel versus Clayes, and that's 72 S.W.2d 833.*

THE COURT: That's an Eastern District case, is it not?

[COGDILLS' COUNSEL]: It is. Yes, it is, your Honor, back when St. Louis was its own district.

The [Cogdills] intended to call the trooper that investigated the accident. That's Trooper Dubois. And we intended to call the coroner, Larry Swinfard, and we intended to call David Nanneman (ph. sp.) who is a criminologist, and a witness to the accident, Christy Melton, all going to what happened in the accident.

And we intended to offer, um—and I'll get to those exhibits in a second. But as I understand the stipulation of the parties, is—and with permission of the Court—

THE COURT: Let me just announce what I think the stipulation is. That might make it quicker.

I'd indicated that I was going to grant the motion in limine because of the fact that I'm of the opinion that if the [DAL] admits liability, and that is not an issue,

the intoxication of [Flanagan] or lack of intoxication is not relevant to the actual issue of damages.

The [Cogdills] asked to make an offer of proof, and my understanding is that there is a stipulation that the trooper's report, which indicates an alcohol level of .129, would be stipulated to as to establishing the fact that [Flanagan], was intoxicated.

[DAL's COUNSEL]: That's correct.

THE COURT: Is that a fair assessment of what we—

[COGDILLS' COUNSEL]: I think it goes even beyond that. Just not—

THE COURT: You may.

[COGDILLS' COUNSEL]:—intoxication, your Honor. I think it goes to the fact of the accident as well, um, about what happened in the accident, the cause of the accident, based on his stipulation this morning that he's not only responsible but liable in damages to the Cogdills because of the negligence.

[DAL'S COUNSEL]: As far as my stip—as far as my admitting to the jury? Yeah, I'm ad—that's correct, I said, and I'll say this on the record that I am stipulating the accident was caused by Flanagan and I'm—and that [Karmon] did sustain an injury in the accident.

[COGDILLS' COUNSEL]: And that they were, in fact—Sammye and Karmon Cogdill were damaged because of the negligence of your client?

[DAL'S COUNSEL]: Yes.

THE COURT: And that the intoxication level of Flanagan was .129 percent?

[DAL'S COUNSEL]: That part I'm stipulating to purely for the purposes of [Cogdills'] offer of proof.

THE COURT: Okay, for the offer of proof.

[COGDILLS' COUNSEL]: Okay. And then, of course, the Court's ruling is a ruling on motion in limine, which, as everybody knows, preserves nothing for appeal.

So with the Court's permission and with the agreement by [DAL's Counsel], we're going to allow me to make oral offers of proof about what my witnesses would testify to so I can preserve what I feel is error in the event this case goes on appeal.

THE COURT: Are you—are you agreeing that [Cogdills' Counsel] can summarize in his words and that will be considered by the Court and accepted as an offer of proof of what those three or four witnesses would testify if they were here personally?

[DAL'S COUNSEL]: Yes[.]

(Emphasis added).

Cogdills then made an oral offer of proof about what they believed their witnesses would testify to on the issue of liability and intoxication, and admitted various exhibits in order to preserve any potential error for appeal.

Cogdills' counsel then stated to the trial court that at the time of the accident, Karmon was a driver for Yellow Freight, and it was their "contention that he retired early because of the trauma and development of [PTSD] in this particular accident." With respect to the Cogdills' contention, the following colloquy took place:

[COGDILLS' COUNSEL]: As part of that analysis, the facts of the accident are very important because of a near-death experience that [Karmon] went through, the fact that he thought that he killed somebody and the fact that he has to deal with drunk drivers on the highway as a professional driver. All of that's relevant not only to what happened in the accident, which goes to liability, but also the development of

[PTSD]. And so for all of those reasons, we think that it's entirely relevant concerning the facts of the accident, the damage to the vehicles, which I understand the Court's going to allow me to get into that, but also the intoxication as well.

THE COURT: Anything further? Well, first of all, as to his comment concerning PTSD, Post–Traumatic Stress Syndrome and so forth, any comment?

[DAL'S COUNSEL]: The only thing I say in response to that—I don't really have anything to add to what I said earlier about the intoxication issue.

But let me just be clear about one thing, I never objected to and I was—the fact that this previous accident had occurred and that the—and that Flanagan had died in that accident, I wasn't really objecting to that to begin with. I was assuming that that was going to be part of the case.

My objection was simply about the alcohol evidence, which I did not feel was relevant. So certainly if he—and I didn't take it that the Court's ruling was excluding anything about the overall circumstances of the accident.

THE COURT: I don't think it did either.

[DAL'S COUNSEL]: Other then the alcohol.

THE COURT: That certainly was not the Court's intention.

[DAL'S COUNSEL]: Okay.

THE COURT: Anything else at this point on preliminary matters?

[COGDILLS' COUNSEL]: No. As I understand the Court's ruling, the only issue we're going to be talking about is the amount of damages and that all other evidence is excluded.

THE COURT: Well, what I excluded was evidence of the alcohol. As far as the facts of the accident insofar as they would—let me back up.

I don't think when we discussed in Chambers there was a reference to [PTSD] and [Karmon] having to retire early as a result of this. The, for lack of a better term, shock, gruesomeness of the accident may be germane if you are asking for damages for lost wages, emotional trauma and so forth. The facts of the case may be rel—of the accident itself may be relevant to those issues. Is that what you are alleging?

[COGDILLS' COUNSEL]: Yes, your Honor. That's exactly right. The whole, for lack of a better term, the res gestae of the whole event—

THE COURT: The "totality." That's the criminal term we use, the totality of the circumstances.

[COGDILLS' COUNSEL]: Right, leads—leads to the development of what ultimately resulted in [PTSD], including the alcohol.

Um, and that's why we think it's very, very important for our case, and we think that the case is—specifically allow us to prove up our case any way that we feel is important to prove up. And at the morning of trial for them to come in and say, oh—it actually happened yesterday or maybe the day before that we're going to admit liability, I think, prejudices the Plaintiff. I really do.

THE COURT: At the expense of, I think it was Justice Holmes said, the consistency of the hobgoblin of a small mind. We didn't talk about at all, and I didn't know that you were alleging damages and requesting damages for—well, let me just ask it: Are you requesting of this jury damages for last [sic] wages for [Karmon]?

[COGDILLS' COUNSEL]: Yes, your Honor.

THE COURT: And also for the traumatic—I'm trying to think of the—emotional stress and trauma of this occurrence leading to, and I'm going to call it PTSD here for short, and that's an element of damages?

[COGDILLS' COUNSEL]: Yes, your Honor.

THE COURT: Are you alleging that [Karmon] knew that the decedent at this point or that [Flanagan] was intoxicated at the time of the accident?

[COGDILLS' COUNSEL]: Yes, your Honor.

THE COURT: And you intend to prove that—it's your—it's your intention, your [sic]want to prove that as an element of damages?

[COGDILLS' COUNSEL]: Yes, your Honor. That he developed as a result of the accident [PTSD].

THE COURT: Okay. See, that—and maybe we didn't—didn't talk long enough in Chambers. That adds a different dimension.

My understanding from our discussion was your allegation of damages was going to be concerning physical injury, the obvious hospital bills, doctor bills, lost wages because he suffered, I think you said, a couple of broken ribs and some other injuries. Am I right on that?

[COGDILLS' COUNSEL]: Aggravation of a neck problem.

THE COURT: Aggravation of a preexisting condition that would have caused him not to be able to work. If your overall contention is that—the totality of the circumstances and, I know that's a criminal term we use concerning searches and so forth—were such that it caused an early retirement and caused a diminution in his income that's perma-nent, I try to be consistent, but I may have to back up and re-examine that.

. . . .

[COGDILLS' COUNSEL]: Can we go off the record a minute?

THE COURT: Let's go off the record a minute.

(OFF THE RECORD)

THE COURT: We are back on the record.

. . . .

THE COURT: . . .

The issue later came up as to the intoxication of [Flanagan]. And we had a fairly lengthy discussion off the record, and my understanding is that there have been depositions taken of Dr. Martin, the psychologist, of [Karmon]. And, gentlemen, is it—it is correct, and I'm going summarize these facts, that [Karmon] may present evidence from which a jury could find that because of the overall trauma of the accident and the fact that the death occurred, [Karmon] retired early. Is that a fair assessment?

[COGDILLS' COUNSEL]: Yes, your Honor.

THE COURT: Up to the point of the facts that we know.

[DAL'S COUNSEL]: Right.

THE COURT: *And I asked both attorneys, did the fact that [Flanagan] was intoxicated in any way, in any discovery with the psychologist, [Karmon] or otherwise come out as a factor in that, and my understanding is, [DAL's Counsel], you said that you have absolutely no indication that that's ever come out.*

[DAL'S COUNSEL]: That's correct.

THE COURT: [Cogdills' Counsel], you didn't really disagree with that. Is that a fair statement?

[COGDILLS' COUNSEL]: It's not that I can't disagree, your Honor. It's that I just don't know.

THE COURT: Okay.

[COGDILLS' COUNSEL]: I mean, if that's what [DAL's Counsel]—if that's what he says, I'll take him at his word. I don't remember what's in Dr. Martin's report or what's in his deposition or what's in Karmon or Sammye's depositions.

THE COURT: And is it true to say that both of you have taken depositions, done your—done your discovery and both of you are satisfied with the amount of discovery done in this case and are ready to proceed today?

[COGDILLS' COUNSEL]: Yes, your Honor.

[DAL'S COUNSEL]: Yes.

THE COURT: All right. Then the ruling will remain. I am not going to allow the evidence of intoxication. We have the offer of proof in the record as to the intoxication.

(Emphasis added).

The trial then proceeded with jury selection, opening statement, and witness testimony. The record before us is not clear, but the Cogdills admit punitive damages were no longer at issue at this point in the proceedings. During opening, DAL's counsel stated:

And the—[Flanagan] had lost control of his vehicle on Interstate 44. Car flipped over and ended up on the road, and [Karmon] came along a very short time right after that and was unable to avoid [Flanagan]'s vehicle. There's no dispute about that, and I have never suggested and I'm not going to suggest to you today that [Karmon] was in any way responsible for this.

At trial, Karmon testified on his own behalf, including testimony regarding his injuries and lost work. He also testified that when he returned to driving, he "had a fear of going to work." He had driven for years and thought he was "indispensable" until this accident. Karmon drove through the area of the accident "three times going out and three times coming back" and he "worried about it every time [he] went through there." Karmon also testified he drove through sections of I–44 where he feared he might encounter "drunk drivers" and began worrying he might be involved in another incident he could not avoid.[3]

Karmon testified he was "hyper-vigilant" after the accident, and had "intrusive thoughts" where he would worry he would be in another accident and could die. He was sleeping poorly, became depressed, was not eating well, his energy level declined, and his kids said he was "grumpy." After discussions, the Cogdills decided Karmon should quit driving for health reasons even though it meant losing that income.

Dr. Thomas Martin ("Dr. Martin"), Director of Adult Neuropsychology at the University of Missouri in Columbia, testified on behalf of the Cogdills. Dr. Martin testified that Karmon underwent a stringent clinical interview, as well as standardized testing for different domains of functioning, as part of Dr. Martin's evaluation of Karmon. Dr. Martin testified that Karmon met the criteria for PTSD and, in his opinion, it was directly related to the mo-

3. DAL's counsel requested a bench conference and moved for a mistrial based on Karmon's reference to "drunk drivers" and being involved in "another incident like that," both statements clearly implying to the jury that drunk driving was involved and in violation of the trial court's ruling regarding any mention of Flanagan's intoxication. After further discussion, the trial court denied DAL's counsel motion for a mistrial.

tor vehicle accident. Dr. Martin explained that PTSD is an anxiety-related disorder and develops in individuals when they are confronted with a very traumatic event. The individual will re-experience the event sometimes resulting in nightmares and flashbacks. Also part of the disorder is the individual's avoidance of things that remind them of the event and sometimes experiencing emotional numbing where they become distant and anti-social. The individual also becomes hyper-vigilant causing them to become "very alert to more trauma, what could happen to me next, am I in danger." Dr. Martin testified that for a patient to be diagnosed as suffering PTSD, their symptoms must be significant enough to interfere with their daily function.

Dr. Martin testified that PTSD could cause trouble sleeping, depression, and lack of energy. He also testified that the bumps and welts Karmon was experiencing on his head were very likely a symptom of his psychological distress manifesting itself. Karmon's symptoms were significantly interfering with his daily functioning and were "affecting every aspect of his life." Dr. Martin testified that all of Karmon's "symptoms, all of the re-experiencing of the trauma are all directly related to that accident." Dr. Martin testified that although he had not seen Karmon until November 7, 2011, he understood Karmon had been diagnosed as early as 2005 by another doctor with PTSD.[4]

Later, after both sides rested and the jury retired to deliberate, Cogdills continued their offer of proof concerning intoxication issues, including calling Karmon to testify to his mental state while he was driving. Karmon testified that after the accident, he learned Flanagan had consumed alcohol prior to the accident, his blood alcohol content was 0.129%, and that driving while intoxicated was a contributing cause of the collision. Karmon testified that both before and after the accident, his truck driving route took him up Interstate 44 to St. Louis, "Interstate 70 to—Interstate 55 to Troy, Illinois and 70 on into Indianapolis" and he had to do his driving of this route at night. There were a lot of bars along this route in places like Fort Leonard Wood and East St. Louis, and he had to go through these places at the time drunk drivers came out—1:00 or 2:00 a.m. Karmon was "afraid [he] might run on into another one in the near future that would be unavoidable." This weighed on Karmon's mind every trip he took at that time of night; every car he encountered he was concerned whether they were drinking and driving and going to do something stupid; and his main source of anxiety was fear of intoxicated drivers. It worked on his mind; he was afraid it was going to happen again.

On April 12, 2012, the jury returned its unanimous verdict in favor of Karmon and against DAL in the amount of $50,000.[5]

---

**4.** Dr. James Schaeffer ("Dr. Schaeffer") also saw Karmon at the request of his attorney, but did not express any opinions regarding Karmon's psychological condition. Dr. Schaeffer's deposition was admitted in evidence and excerpts from his deposition were read to the jury. Karmon reported to Dr. Schaeffer right neck pain radiating towards the shoulder and chest pain with heavy lifting, relayed to him he had retired primarily due to neck pain and discomfort from a hernia, and that he was not comfortable driving any more. Dr. Schaeffer did not recall Karmon specifically stating he was experiencing psychological problems, nor that the reason he retired was due to any psychological problems with the accident.

**5.** Neither the jury verdict, nor the jury instructions presented to the jury, were included in the legal file or appendix provided to this Court.

On May 15, 2012, the trial court entered its Judgment in accordance with the verdict. Cogdills filed their "Motion for New Trial" on May 21, 2012, in which they argued that the trial court erred in disallowing them to introduce evidence of Flanagan's intoxication.[6] This appeal followed.

In their two points relied on, the Cogdills allege the trial court erred in disallowing them to introduce evidence of Flanagan's intoxication for two reasons: (1) Missouri law does not authorize the exclusion of such evidence even though the DAL admitted liability because the party bearing the burden of proof is not bound by a party's admission; and (2) evidence of Flanagan's intoxication was relevant to the Cogdills' claim for damages for PTSD and fear of driving at night.

The issue for our determination is whether the trial court erred in excluding evidence of Flanagan's intoxication or can a defendant force a plaintiff to try the case on damages only by admitting liability. We conclude this was error.

## Standard of Review

■ A trial court " 'enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal.' " *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (quoting *State v. Mayes*, 63 S.W.3d 615, 629 (Mo. banc 2001)). We presume the trial court's ruling is correct, and reverse only when the

> ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Anglim v. Mo. Pac. R.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992). "The focus on appeal of a ruling excluding evidence is not whether evidence was admissible but on whether the trial court abused its discretion in excluding the evidence." *Payne v. Cornhusker Motor Lines, Inc.*, 177 S.W.3d 820, 836 (Mo.App. E.D.2005).

■ To be admissible, evidence must be both logically and legally relevant. *Crow v. Crawford & Co.*, 259 S.W.3d 104, 122 (Mo.App.E.D.2008). "Logically relevant evidence makes a fact of consequence to the outcome of the case more or less probable, or corroborates other relevant evidence." *Moon v. Hy–Vee, Inc.*, 351 S.W.3d 279, 285 (Mo.App.W.D.2011). "Legal relevance requires balancing the probative value of the evidence versus its prejudicial effect on the jury." *Eckerd v. Country Mut. Ins. Co.*, 289 S.W.3d 738, 743 (Mo.App.E.D.2009).

## Analysis

### Point I: Trial Court Abused its Discretion in Excluding Evidence of Flanagan's Intoxication

■■ Here, we find the trial court did abuse its discretion in excluding evidence of Flanagan's intoxication. The general rule in Missouri as to a judicial admission was stated in *Ruppel v. Clayes*, 230 Mo. App. 699, 72 S.W.2d 833 (ST.L.D.1934): "[a] party is not required to accept a judicial admission of his adversary, but may insist on proving the fact." *Id.* at 835

---

**6.** The trial court never ruled on the Cogdills' Motion for New Trial so by operation of Rule 81.05(a)(2)(A), the Motion for New Trial was deemed overruled on August 19, 2012, and the Judgment became final on September 18, 2012.

All rule references are to Missouri Court Rules (2013).

(internal quotation and citation omitted). Phrased another way, a "party bearing the burden of proof is not bound to a party's admission." *Ingram v. Rinehart*, 108 S.W.3d 783, 792 (Mo.App.W.D.2003). Instead, the party bearing the burden of proof "may elect to present evidence to prove the issue at jury trial." *Id.*

"[*Ruppel*] has been followed and has never been questioned[,]" and is still the general rule in Missouri. *Franklin v. Byers*, 706 S.W.2d 230, 231 (Mo.App.W.D. 1986) (citing *McKay v. Delico Meat Products Co.*, 351 Mo. 876, 174 S.W.2d 149 (1943); *Steele v. Goosen*, 329 S.W.2d 703 (Mo.1959)). In *Ruppel*, the defendant alleged the trial court erred in permitting plaintiff's counsel to tell the jury in opening statement that plaintiff expected to show that defendant was under the influence of liquor at the time of the accident after defendant's counsel had told the court, out of the hearing of the jury, that he would admit defendant's liability in the case and would object to any reference of intoxicating liquor. 72 S.W.2d at 833. Similar to this case, the *Ruppel* defendant denied every allegation in plaintiff's petition. *Id.* at 834. Then, at trial, the defendant made a qualified "admission of liability" in stating "[w]e are coming to you and admitting that if Mr. Ruppel was injured in this case we are liable for his injury. We are not going to deny that we are liable for his injury, if you find he was injured[.]" *Id.*

The *Ruppel* court first noted that when considering the question of excluding evidence of defendant's intoxication, "it must be remembered that plaintiff's petition charged that defendant operated his automobile while he was under the influence of intoxicating liquor, and that defendant's answer, by way of a general denial, put this charge ... in issue." *Id.* at 835. Similarly, the Cogdills' Second Amended Petition alleged Flanagan operated a motor vehicle while intoxicated, and DAL's Answer denied this allegation putting the issue of Flanagan's intoxication in issue.

Next, the *Ruppel* court noted the defendant made a qualified admission of liability, which did not deny plaintiff the privilege to introduce evidence in his own way. *Id.* Likewise, DAL began this case in front of the jury with a qualified admission at best.[7] For instance, during opening, DAL's counsel stated:

> And the—[Flanagan] had lost control of his vehicle on Interstate 44. Car flipped over and ended up on the road, and [Karmon] came along a very short time right after that and was unable to avoid [Flanagan]'s vehicle. There's no dispute about that, and I have never suggested and I'm not going to suggest to you today that [Karmon] was in any way responsible for this.

From *the beginning* of this case, DAL did not explicitly admit that Flanagan was negligent and the accident was Flanagan's fault. Rather, he simply stated that he was not suggesting *that Karmon* was responsible. This admission differs from an unequivocal admission of a party's liability. It goes to an issue of comparative fault, quite different from an issue of liability.

---

7. The dissent observes the Cogdills did not complain that DAL waffled on liability. This position ignores the Cogdills' argument that DAL's answer "contained no clue that [DAL] intended to admit liability." Furthermore, the Cogdills cite *Ruppel,* and quote the following from *Steele v. Goosen,* 329 S.W.2d 703, 712 (Mo.1959): A party is "not bound by [his opponent]'s admissions nor bound to accept them as sufficient, [and can] make his proof in any legitimate manner." The record before this Court indicates the Cogdills questioned the extent of DAL's admission, even requesting to show the jury DAL's Answer asserting Karmon's alleged negligence was a cause of his injuries.

DAL's "qualified admission" was also confusing because he stated that he had "never suggested and I'm not going to suggest to you today that [Karmon]" was responsible. This was not an accurate statement because DAL's Answer to the Second Amended Petition asserted that Karmon's carelessness and negligence in failing to keep a careful lookout and in driving at an excessive rate of speed contributed to cause his injuries.[8] DAL's Answer was filed approximately three months prior to trial and was never amended.

DAL's opening statement simply established that he would not attempt to blame Karmon at trial, conceding there was no comparative fault, but did not concede Flanagan's fault for the accident. DAL attempted an *equivocal* admission in order to prevent the exclusion of evidence unfavorable to DAL.

There may be circumstances when an unequivocal and full admission of liability *may* leave only the issue of damages for a jury, but such admission must be clear. *See Ruppel,* 72 S.W.2d at 835 (noting that "even if defendant has made an unqualified general 'admission of liability,' . . . it would [still] have been the privilege of plaintiff to make such statement to the jury and to introduce, in his own way, such evidence as was relevant to the issue[.]"). An unequivocal admission of liability may be *clearly* made in writing in a party's pleading. However, the admission must be clear, full, and unequivocal. In *Franklin,* 706 S.W.2d at 231, the defendant admitted the allegation of general negligence, but denied specific allegations of negligence by way of a second amended answer. Defendant argued because negligence was admitted, the

only issue for determination was damages and evidence of intoxication was irrelevant and inadmissible. *Id.* The court found the issue of driving while intoxicated was denied by way of the pleadings as "[t]here [was] no clear and unequivocal admission of liability asserted *in the pleading.*" *Id.* (emphasis added).

Under the *Franklin* holding, DAL never made an unequivocal admission of liability in that his answer specifically denied the allegation that Flanagan operated a motor vehicle while intoxicated with alcohol. In fact, DAL kept Flanagan's liability in issue, including the claim he drove while intoxicated, up until sometime the week before trial when DAL informed the Cogdills he was going to admit liability.[9] However, there is no record that DAL amended his Answer to admit liability and thereby removed Flanagan's liability as an issue at trial. If there is no such amendment, plaintiffs have no choice but to prepare to present evidence of liability to the jury.

Even more troubling in this case is that DAL's *eleventh-hour* attempt to admit liability appears to be designed solely to exclude evidence of Flanagan's intoxication. Up until this point, the Cogdills had prepared their case, including trial strategy and witnesses, to include proof of Flanagan's liability and intoxication. Cogdills had subpoenaed and made arrangements to call numerous witnesses and admit exhibits on the issue of Flanagan's liability. The general rule in Missouri is that the Cogdills "are entitled to prove the essential facts, to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admis-

---

8. The Cogdills' counsel pointed out this qualification to the trial court when requesting to show the jury DAL's Answer asserting Karmon's alleged negligence as a cause of his injuries.

9. DAL's Answer also included an affirmative defense alleging Karmon's carelessness and negligence caused or directly contributed to cause his injuries.

sion might have the effect to rob the evidence of much of its fair and legitimate weight." *Ruppel,* 72 S.W.2d at 836.

Finally, DAL has cited no cases, and we have found none, which hold that a plaintiff is bound to accept the admissions of a party defendant with respect to an issue in the case and is precluded by such admission from presenting his evidence to prove his case in his own way. *Id.* at 835.

We find the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration for numerous reasons. First, it is contrary to the general rule in Missouri that the party bearing the burden of proof is not bound to a party's admission. *Id.* Second, the record does not reflect how the trial court concluded intoxication evidence should be excluded in light of *Ruppel.* When the issue was first raised by the trial court, Cogdills' attorney specifically cited *Ruppel* as follows:

> [COGDILLS' COUNSEL]: And we intended to prove up liability in this case, and that was our intent based on

Ruppel versus Clayes, and that's 72 S.W.2d 833.

> THE COURT: That's an Eastern District case, is it not?

> [COGDILLS' COUNSEL]: It is. Yes, it is, your Honor, back when St. Louis was its own district.

The trial court focused on the relevance of the evidence to the exclusion of the law stated in *Ruppel.* In fact, the qualified admission by DAL would, in theory, remove the materiality of the evidence in the case as opposed to its relevancy.

There was no clear, full, and unequivocal admission of liability by DAL which could arguably permit the trial court to stray from the general rule in Missouri. The transcript does not detail how the trial court reasoned that the Cogdills could not elect to present evidence to prove the liability issue to the jury. We agree the transcript gives a fair summary as to why the trial court concluded evidence of intoxication was excluded because it was not relevant to Cogdills' damages claim.[10] However, no such similar reasoning following Cogdills' argument they "intended to prove up liability" in their case was provided by the trial court. The trial court

---

10. This is evident by the trial court's following conversation with counsel:

THE COURT: *And I asked both attorneys, did the fact that [Flanagan] was intoxicated in any way, in any discovery with the psychologist, [Karmon] or otherwise come out as a factor in that, and my understanding is, [DAL's Counsel], you said that you have absolutely no indication that that's ever come out.*

[DAL'S COUNSEL]: That's correct.

THE COURT: [Cogdills' Counsel], you didn't really disagree with that. Is that a fair statement?

[COGDILLS' COUNSEL]: It's not that I can't disagree, your Honor. It's that I just don't know.

THE COURT: Okay.

[COGDILLS' COUNSEL]: I mean, if that's what [DAL's Counsel]—if that's what

he says, I'll take him at his word. I don't remember what's in Dr. Martin's report or what's in his deposition or what's in Karmon or Sammye's depositions.

THE COURT: And is it true to say that both of you have taken depositions, done your—done your discovery and both of you are satisfied with the amount of discovery done in this case and are ready to proceed today?

[COGDILLS' COUNSEL]: Yes, your Honor.

[DAL'S COUNSEL]: Yes.

THE COURT: All right. Then the ruling will remain. I am not going to allow the evidence of intoxication. We have the offer of proof in the record as to the intoxication. (Emphasis added).

simply glossed over the Cogdills' right to present their case. For that reason, we find the trial court's ruling lacked careful consideration of Missouri's general rule allowing the party bearing the burden to prove his case.

In light of our findings, we sustain Cogdills' Point I. Finding Point I dispositive, we need not address the claims of error in Point II.

### Conclusion

We conclude the trial court erred in excluding evidence of Flanagan's intoxication. Therefore, Cogdills' Point I is granted and we remand the case for a new trial in accordance with this ruling.

NANCY STEFFEN RAHMEYER, P.J., concurs.

DANIEL E. SCOTT, J., dissents in separate opinion.

DANIEL E. SCOTT, J.

Our focus may surprise the parties. On appeal, the Cogdills did not complain that the DAL waffled on liability at trial and never argued this as a basis for reversal.[1] This suggests that perceptions of waffling drawn from a cold record without benefit of advocacy by the parties, albeit honestly held, may be misguided.[2] At any rate, this is no reason to reverse when the appellants do not complain and the respondent gets no prior notice or opportunity to defend against the theory. Per Rule 84.13(a), non-jurisdictional allegations of error "shall not be considered in any civil appeal" unless properly briefed.

That said, I acknowledge *Ruppel's* dicta about a plaintiff's "privilege" to prove intoxication although liability is fully admitted and punitive damages are not sought.[3] Without debating such logic, the flip side is a trial court's better-established privilege (if not duty) to exclude logically relevant evidence "if its costs outweigh its benefits." *Pittman v. Ripley Cnty. Mem'l Hosp.*, 318 S.W.3d 289, 294 (Mo.App.2010); *Shelton v. City of Springfield*, 130 S.W.3d 30, 37 (Mo.App.2004).

To elaborate, "evidence must be both logically and legally relevant in order to be admissible," and cannot be admitted "if it fails to satisfy either prong of this bifurcated relevancy standard." *Pittman*, 318 S.W.3d at 293. Even if intoxication retained any *logical* relevance here after liability was conceded, determining its *legal* relevance required the trial court to balance:

> the probative value of the proffered evidence against its prejudicial effect on the jury. Stated another way, legal relevance is determined by weighing the probative value of the evidence against its costs, including unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. Thus, logically relevant evidence is excluded if its costs outweigh its benefits.

> We are of the opinion that, even if defendant had made an unqualified general "admission of liability" instead of the decidedly qualified one which he did make, it would, nevertheless, have been the privilege of plaintiff to make such statement to the jury and to introduce, in his own way, such evidence as was relevant to the issue referred to.

1. Indeed, at oral argument, the Cogdills specifically agreed that liability and comparative fault "were out of the case" when the trial started.

2. I do not discern waffling on liability at trial. *See* Appendix to Dissent.

3. *See Ruppel v. Clayes*, 230 Mo.App. 699, 72 S.W.2d 833, 835 (St.L.D.1934), in which that court said:

*Id.* at 294 (quoting *Shelton*, 130 S.W.3d at 37). Ultimately, this decision rested "within the sound discretion of the trial court." *Id.*

> The trial court is in the best position to evaluate whether the potential prejudice of relevant evidence outweighs the relevance. It is vested with broad discretion in ruling questions of relevancy of evidence and, absent a clear showing of abuse of that discretion, the appellate court should not interfere with the trial court's ruling.

*Pittman*, 318 S.W.3d at 294 (citations, quotation marks, and brackets omitted).

This means that we interfere *only* if the ruling was so clearly illogical, unreasonable, and arbitrary "that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* In other words, even if this evidence was erroneously excluded, we should "reverse only if the error results in substantial and obvious injustice." *Id.* (quoting *Shelton*, 130 S.W.3d at 37).

To state these standards and read the transcript is to know why we should not reverse. The record shows how the trial court "struggled" with this issue, as the Cogdills' counsel put it twice at argument. There was no "lack of careful, deliberate consideration," *id.*, but the polar opposite. This experienced trial judge patiently listened to both sides, asked questions, weighed input, and reconsidered when new arguments were made, all in an effort to rule a tough issue well and try a clean case.[4] Reasonable minds may differ on his ruling, but I cannot brand it so illogical, unreasonable, arbitrary, and ill-considered that it shocks our sense of justice.

Proper deference, in my view, compels us to affirm.[5] I respectfully dissent.

## Appendix to Dissent

As noted in the dissent, I do not discern waffling or uncertainty at trial about liability. To quote the transcript (emphasis added):

*During pre-trial proceedings:*

> [Cogdills' counsel]:—intoxication, your Honor. I think it goes to the fact of the accident as well, um, about what happened in the accident, the cause of the accident, *based on his stipulation this morning that he's not only responsible but liable in damages to the Cogdills because of the negligence.*

> [DAL's counsel]: As far as my stip— as far as my admitting to the jury? Yeah, I'm ad—*that's correct, I said, and I'll say this on the record that I am stipulating the accident was caused by Flanagan and I'm—and that Mr. Cogdill did sustain an injury in the accident.*

> [Cogdills' counsel]: *And that they were, in fact—Sammye and Karmon Cogdill were damaged because of the negligence of your client?*

> [DAL's counsel]: *Yes.*

*From the parties' opening statements:*

> [Cogdills' counsel]: *And, again, the issue of liability was, was Mr. Flanagan responsibility for this for this particular incident, this collision ? That's not for the jury's consideration. That's already been determined. That's already been admitted. He was totally responsible. There's no claim that Kar-*

---

4. In the last analysis, I think the trial judge was successful. Jurors reached two unanimous verdicts in 38 minutes. The only claims of error involve a single exclusion of evidence.

5. I find no merit to Point II given the record cited in the principal opinion and our standard of review.

mon bore any responsibility for this particular accident.

\* \* \*

That's the speedometer of Mr. Flanagan, but we won't interpret that now, *because like I say, they admitted liability.*

\* \* \*

*You are not going to hear from the Highway Patrol or any of the other folks that were involved in this investigation because liability has been admitted.* So we've shortened this trial down some.

\* \* \*

[DAL's counsel]: And the—Mr. Flanagan had lost control of his vehicle on Interstate 44. Car flipped over and ended up on the road, and Mr. Cogdill came along a very short time right after that and was unable to avoid Mr. Flanagan's vehicle. There's no dispute about that, and I have never suggested and *I'm not going to suggest to you today that Mr. Cogdill was in any way responsible for this. So you don't have to worry about that aspect of the case, as we've mentioned to you before.*

*The question is the damages.*

*From the parties' closing arguments:*

[Cogdills' counsel]: Now, let me comment on one thing. During open statement Mr. Hart said, we've always admitted liability in this case. *They didn't admit liability until a week ago.* Up until that time, it was his fault. A week before the trial all of the sudden, okay, it's all our fault.

*Now, there's certain undisputed facts in this case that you don't even need to consider, because they're proven, they're taken as undisputed facts . . . .*

The Defendant in this case is responsible or liable, legally liable for the damages that he caused to Karmon and Sandy. That's undisputed. In fact, that's the instruction the Court read.

\* \* \*

[DAL's counsel]: *Now, first of all, I told you yesterday that there's no dispute about the fact that Mr. Flanagan caused this accident, and there's no dispute that Mr. Cogdill sustained an injury in the accident. So I'm sure that you will return a—an award of damages for Mr. Cogdill.*

*The question is, how much?*